# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-25-00526-CV

---

**E. D., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 424TH DISTRICT COURT OF BURNET COUNTY**
**NO. 56647, THE HONORABLE CHERYLL MABRAY, JUDGE PRESIDING**

---

## MEMORANDUM OPINION

Father appeals from the trial court's order terminating his parental rights to his two children Ethan (born 2021) and Charlie (born 2023).[1] *See* Tex. Fam. Code § 161.001. Following a bench trial, the trial court found by clear and convincing evidence that Father had endangered the children by conduct and constructively abandoned them and that termination of Father's rights was in the children's best interest. *See id.* § 161.001(b)(1)(E), (N), & (2). Father argues the evidence is insufficient to support the trial court's predicate findings of endangerment by conduct and constructive abandonment. We conclude that the evidence was legally and factually sufficient to prove endangerment by conduct and thus affirm.

---

[1] To protect the privacy of the minor children, we use pseudonyms Ethan and Charlie to refer to the children and Mother and Father to refer to their parents. Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8(b)(2).

## BACKGROUND

On August 10, 2021, Mother gave birth to Ethan while Father was in the Travis County Jail. Mother used illegal drugs while pregnant and Ethan tested positive for them when he was born. Ethan stayed in the neonatal intensive care unit (NICU) for his first three months. Father got out of jail in time to spend some time with Ethan while he was in the NICU. By the time the NICU released Ethan, Mother was incarcerated. Ethan was released to the Department of Family and Protective Services and placed in foster care. Father continued to visit Ethan for the next few months. By mid-May of 2022, Father was again incarcerated, this time in the Texas Department of Criminal Justice (TDCJ).

In May 2023, pursuant to a mediated settlement agreement, he and Mother were named joint managing conservators of Ethan, with Mother designated as the conservator with the exclusive right to determine the primary residence of Ethan. Father saw Ethan through video visits. In June of 2023, Mother gave birth to Charlie; Father has never met Charlie face to face.

In early March 2024, Father's sister, Amy, contacted the Department, with concerns about Ethan and Charlie. Father had, for the last several months, been asking Amy to do so because he knew, through both Amy and Mother, that Mother had moved out of Amy's place and had started a relationship with an abusive man. Amy hesitated to make the call; "It was a very hard thing for me to do because I love [Mother] as well. She's the mother of my nephews so I love her very much, too." She explained,

> When I contacted CPS, I let them know, for one, that I was calling on behalf of my brother [Father]. That he was the one that made me call them. Upon telling them that, that's when I went into extensive detail of the conditions that [Mother] had my nephews in. I also went [in]to extensive detail of the person that she had around my nephews . . . . a very bad gentleman. I also informed them of her drug use[.]

2

She told the Department that Mother was "possibly under the influence"; there was "domestic violence in the residence"; Mother "had a black eye"; and the youngest child, Charlie "was in a swing, soiled diaper and dirty, unattended." Amy had also called the police about Mother's black eye.

After a welfare check, the Department filed a petition to terminate Father and Mother's parental rights, and it obtained temporary managing conservatorship over the children. Although Father was incarcerated for the duration of this case, he completed all services requested of him—curriculum on parenting, anger management, and sobriety—and did extra work in prison beyond the service plan. But he was repeatedly denied parole, in part because he had used methamphetamines while incarcerated.

On June 30, 2025, and July 1, 2025, the trial court held a bench trial at which Father—still in TDCJ custody but with a hard discharge release date of September 24, 2025— appeared. At that time Ethan was three, Charlie had just turned two, and they resided with the second foster placement, who were willing to adopt. Both children had special needs that were being met. Ethan was in physical, occupational, and play therapy. Charlie was in physical, speech, and play therapy.

The trial court heard testimony from five witnesses: (1) Father; (2) the CASA volunteer, Veronica Kam; (3) Father's sister, Amy; (4) the Department's prior caseworker, Karon Gayoso; and (5) the Department's current caseworker, Johanna Foster. At the conclusion of trial, the trial court rejected Father's suggestion—to name the Department permanent managing conservator, and allow Father "to keep his parental rights and work some services from outside the prison cell walls to show the Department that he's serious about what he says, he wants to become a good parent"—and signed an order terminating Father's parental rights on its predicate findings

3

of endangerment by conduct and constructive abandonment, and its finding that termination was in the best interest of the children. The trial court also terminated Mother's parental rights, pursuant to another mediated settlement agreement it approved.[2] Father appealed.

## ANALYSIS

### *Sufficiency of the Evidence*

Father complains that the evidence is legally and factually insufficient to support the trial court's predicate findings under Texas Family Code subsections 161.001(b)(1)(E) (endangerment by conduct) and (N) (constructive abandonment).

#### *Applicable Law and Standard of Review*

"A parent's fundamental right to the care, custody, and control of his child is of constitutional magnitude." *In re J.W.*, 645 S.W.3d 726, 740 (Tex. 2022). A trial court may terminate a parent's right to his child if it finds by clear and convincing evidence both that (1) the parent committed a predicate act prohibited under section 161.001(b)(1), and (2) termination is in the child's best interest. Tex. Fam. Code § 161.001(b)(1), (2). Clear and convincing evidence is evidence of a measure or degree that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Id*. § 101.007. "This

---

[2] Mother agreed to termination based on stipulations that (1) she "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child"; and (2) termination of her parental rights was in the best interest of the children. Tex. Fam. Code § 161.001(b)(1)(O), & (2). That portion of the order is not at issue in this appeal.

heightened burden of proof affects the standard of review in an evidentiary challenge on appeal." *In re J.W.*, 645 S.W.3d at 741.

"It does not dispel, however, the deference that an appellate court must grant to the factfinder, who heard the witnesses and evaluated their credibility." *In re J.F.-G.*, 627 S.W.3d 304, 311–12 (Tex. 2021). "In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *In re A.C.*, 560 S.W.3d 624, 630-31 (Tex. 2018). "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631.

"Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

Only one predicate ground is necessary to support a judgment for termination. Tex. Fam. Code § 161.001(b)(1). Due process mandates that appellate courts consider sufficiency challenges to any endangerment findings because termination of a parent's rights under the endangerment subsections can serve as a ground for termination of his rights to another child. *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019); Tex. Fam. Code § 161.001(b)(1)(M). To endanger children is to expose the children to loss or injury. *In re J.W.*, 645 S.W.3d at 748. Endanger means

5

more than a threat of or possibility of injury. But children may be endangered even if the offending conduct is not directed at them, and they are not injured. *Id.* Subsection (E) can be utilized as a ground for termination when the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). "A factfinder may infer endangerment from 'a course of conduct' that presents substantial risks to the child's physical or emotional well-being[.]" *In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024). To determine that course of conduct, we look at the parent's conduct and its direct impact on the children's well-being both before and after removal. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

*Application*

"Texas cases have considered the involuntary termination of the rights of an imprisoned parent, and have held that mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child." *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). But "[a] parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *In re J.F.-G.*, 627 S.W.3d at 313. In *In re J.F.-G.*, the supreme court held that evidence that the "father committed increasingly serious crimes—among them, possession of a controlled substance, sale of marijuana, and robbery" supported termination of the father's parental rights under subsection (E), because the resulting abandonment presented a risk to the child's physical or emotional well-being. *Id.* at 315.

6

The supreme court later confirmed that endangerment under subsection (E) does not require the parent's conduct to directly harm the children; the question is whether there is evidence that the parent exhibited a pattern of behavior presenting a substantial risk of harm to the children. *In re of N.L.S.*, 715 S.W.3d 760, 764 (Tex. 2025) (per curiam). In that case, the father had been convicted of increasingly serious crimes since 2008 including drug possession, burglary, theft of a firearm, felon in possession of a firearm, evading arrest, credit card abuse, and family violence. *Id.* at 765. Although half of the crimes occurred before the child's birth, the supreme court considered it "evidence of an endangering course of conduct" which continued after the child was born, with father continuing to engage in criminal behavior resulting in incarceration. *Id.* The father in that case testified that he had never provided the child financial assistance, could not provide a safe and stable home for the child, and could not provide the Department with any alternative placements. *Id.* at 766. As in *N.L.S.* and *J.F.-G.*, the trial court heard evidence that Father (1) exhibited a pattern of behavior presenting a substantial risk of harm to the children; (2) has never provided much financial assistance; (3) could not provide a safe and stable home for them; and (4) could not provide the Department with a suitable alternative placement.

First, as in the above cases, Father exhibited a pattern of behavior—criminal behavior that is "evidence of an endangering course of conduct." *See id.* at 765; *In re J.F.-G.*, 627 S.W.3d at 315. Father testified that for most of his life, and he was now 41 years old, he had been in and out of the foster, juvenile, and criminal justice systems. He admitted to the following criminal history:

| Date of Conviction | Offenses | Date of Offense | Sentence |
|---|---|---|---|
| 12/09/05 | Possession of a Controlled Substance | 08/15/02 | 2 Years |
| 12/09/05 | Unauthorized Use of Motor Vehicle | 09/28/02 | 2 Years |
| 12/09/05 | Unauthorized Use of Motor Vehicle | 10/11/05 | 2 Years |

7

| 02/04/09 | Assault with Family Violence | 05/09/08 | 365 Days |
|---|---|---|---|
| 02/04/09 | Assault | 09/29/08 | 365 Days |
| 02/04/09 | Assault with Family Violence | 09/29/08 | 365 Days |
| 02/04/09 | Cruelty to Animals | 09/29/08 | 365 Days |
| 10/26/22 | Fraudulent Use or Possession of Identifying Information Less Than 5 Items | 05/18/21 | 180 Days |
| 10/26/22 | Attempted Unlawful Possession of a Firearm By a Felon | 05/18/21 | 180 Days |
| 01/25/23 | Theft of Mail From 10 or More But Less Than 30 Addresses | 04/11/20 | 100 Days |
| 08/22/23 | Unlawful Possession of a Firearm By a Felon | 03/27/21 | 3 Years' TDCJ |
| 08/23/23 | Tampering With Physical Evidence | 03/27/21 | 3 Years' TDCJ |

In addition to the twelve convictions, many of which were state jail or third-degree felonies, Father had, in 2012, been put on five years' deferred adjudication probation for injury to an elderly individual.

Father committed increasingly serious crimes—among them crimes involving fraud and violence and firearms. Father argued that his behavior before the birth of his children should not be weighed against him, but as discussed above, the Supreme Court of Texas has held that it is relevant, and the trial court here apparently found it so. *In re N.L.S.*, 715 S.W.3d at 765; *cf. In re J.O.A.*, 283 S.W.3d at 345 (to determine course of conduct, courts look at parent's conduct both before and after removal). Caseworker Karon Gayoso agreed that in committing the latest crimes, just a few months before Mother gave birth to Ethan—knowing Mother had a history of drug abuse, incarceration, and a chaotic lifestyle—Father had risked leaving Ethan in conditions that would endanger his physical health or emotional well-being. *See In re J.W.*, 645 S.W.3d at 749 (parent's knowledge of other parent's drug use during pregnancy and corresponding failure to attempt to protect unborn child from effects of that drug use can support an endangerment finding). And in fact that risk became reality when he was sentenced to three years in TDCJ. *See In re J.F.-G.*, 627 S.W.3d at 315 (father would or should have been aware that criminal conduct risked

separating him from child for years, as, in fact, it did); *In re N.L.S.*, 715 S.W.3d at 766 (trial court entitled to credit caseworker's testimony that incarcerated father knew mother's inability to parent child had left child in precarious living situation). Caseworker Gayoso was also concerned that Father continued his criminal activity while in prison (and after Charlie had been born) by using methamphetamine, which had short-circuited his release in November of 2024. Asked why he made that choice, Father testified:

> I never had intention of going down there the whole time before I even got—My first parole was denied. My second parole was denied. And I was working the program. I was in changes. I was doing everything I was supposed to do. At the time I felt hopeless.
>
> And, then, dealing with the fact that I knew my sons' mother was getting beaten and my kids weren't in a safe environment and that I couldn't do nothing about it, it was emasculating. And I admit, it was a very poor decision that I chose to do that and it reflects badly today. And I get why y'all's stance, but at the same time I will say I was in pain and I did not want to feel that. And if there would have been other means, such as like going to a counselor, there's no such thing in TDC, or admitting or trying to talk to another inmate that I felt in my soul was being crushed everyday. The only thing that I could embrace at that time was a mind-altering substance because I didn't want to face reality at the time.

Caseworker Gayoso corroborated Father's statement about the lack of an available therapist; "There wasn't a therapist assigned where he could go in and visit . . . I'm indicating there was none available"—neither in the Department's system nor in TDCJ's system. Nevertheless, Father's choice to self-medicate while in prison jeopardized his ability to be available for his children, just as he acknowledged to the trial court. *See In re R.R.A.*, 687 S.W.3d at 281 (parent's pattern of illegal use of controlled substance like methamphetamine relevant to finding of endangerment under (E) when the evidence shows it adversely affected parent's ability to parent, presenting substantial risk of harm to child's health and safety).

9

Second, with regard to financial support, Father acknowledged that, after he "caught all these cases," he had a hard time finding work; he had "made some poor decisions as far as providing for myself, [Mother] and what was soon to be my family." While in the Hays County jail, Father released his stimulus check to Mother and the first foster placement. Father was "fully aware" it would be difficult to find work once he got out.

Third, Father also acknowledged that he himself could not provide a safe and stable home; he acknowledged he would be initially relying on Amy when he finished his sentence. Given Amy's testimony that she was under a felony indictment, and CASA Veronica Kam's testimony that the children have various therapies they need to continue, that plan may have struck the trial court as precarious—and presenting a risk of more instability. Caseworker Gayoso testified that the Department had just learned of his release date, but "he doesn't have a job, and there is no stability whatsoever at this point. He doesn't have stability."

Fourth, Father also named Amy as a suitable alternative, but Amy could not pass the home study because she and her live-in boyfriend both tested positive in their drug screenings. Amy testified that she is a former addict and had a relapse with methamphetamine during the pendency of this case, and that she has a current criminal charge pending—felony injury to an elderly individual.

But Father, in contrast to the fathers in *In re J.F.-G.* and *In re N.L.S.*, did express concern about how his children were doing, and talked to his sister Amy frequently for updates. *Cf. In re. J.F.-G.*, 627 S.W.3d at 315, 318 (father chose not to monitor child's safety during his incarceration; father testified he did not know details of child's living situation—and that she was at risk—until Department initiated proceedings); *In re N.L.S.*, 715 S.W.3d at 766 (no evidence father took any measures to contact child before Department initiated proceedings or to be part of

10

decisions regarding child's well-being while incarcerated). Here, when Amy started to report negative things, he asked her to contact the Department. Caseworker Gayoso recognized that, in doing so, he was looking out for the children's safety and welfare from behind bars.

He had also written a letter to the children's first placement expressing concern about Mother because he knew Mother had been losing weight, was back on narcotics, and could not be a good mother while on narcotics. And he wrote letters to his children about two months before trial, and, knowing they were not old enough to read, he drew elaborate pictures of crowns and lions with the boys' names written in script.

Father, unlike the fathers in *In re J.F.-G.* and *In re N.L.S.*, put the children first when he had Amy contact the Department. And Father's efforts in this regard may be why the second caseworker, Johanna Foster, when asked what would be wrong with naming the Department permanent managing conservator without terminating Father's rights, so that Father could prove his worthiness once he got out of prison, stated, "I don't know."

But, we must accord the trial court's finding—that Father's criminal course of conduct did endanger his children—the deference it is due, because it is supported by the undisputed facts set out above. Father himself acknowledged his criminal history, acknowledged that he was aware that Mother had a history of drug abuse, incarceration, and a chaotic lifestyle, and acknowledged that he continued to make choices that took or kept him physically away from the children, leaving them in conditions that endangered their physical health and emotional well-being. As caseworker Gayoso testified, because of those choices, Father "doesn't have a relationship with either child," and "has never physically had any interaction with his son [Charlie], and he has never built a rapport with either one."

11

In our legal-sufficiency review, we may not attribute greater weight to Father's recent improvements and less to his past challenges, when the trial court did not. *In re J.F.-G.*, 627 S.W.3d at 317; *In re J.O.A.*, 283 S.W.3d at 346. Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support its decision that termination of Father's parental rights was justified under subsection 161.001(b)(1)(E). *In re J.F.-G.*, 627 S.W.3d at 311–12. Further, in view of the entire record, we conclude the disputed evidence (and there was little) was not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under subsection 161.001(b)(1)(E). *In re A.C.*, 560 S.W.3d at 631. Accordingly, we conclude the evidence is legally and factually sufficient to support the predicate finding. Having concluded the evidence is sufficient to support the trial court's finding under subsection (E), we need not review the sufficiency of the evidence to support its subsection (N) finding. *See In re N.G.*, 577 S.W.3d at 237. We overrule Father's appellate issues.

## CONCLUSION

We affirm the decree terminating Father's parental rights and naming the Department managing conservator.

_____

Chari L. Kelly, Justice

Before Justices Triana, Kelly, and Theofanis

Affirmed

Filed:   December 18, 2025

12